UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER, et al.        :
                                   :
        Plaintiff,                 :
                                   :
    v.                             :        Civil Action No. 06-1942 (GK)
                                   :
DISTRICT OF COLUMBIA, et al.       :
                                   :
        Defendant.                 :
                                   :

## MEMORANDUM OPINION

Plaintiffs, Equal Rights Center, Lewis Starks, and Robert Coward, bring this action against Defendants, the District of Columbia and Buddy Roogrow in his official capacity as the Executive Director of the District of Columbia Lottery, for violations of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 et seq., the Rehabilitation Act, 42 U.S.C. § 794 et seq., and the D.C. Human Rights Act, D.C. Code § 2-1401.01 et seq. This matter is before the Court on Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment [Dkt. No. 76] and Plaintiffs' Motion for Partial Summary Judgment [Dkt. No. 77]. Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, and for the reasons stated below, Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment is **denied** and Plaintiffs' Motion for Partial Summary Judgment is **denied.**

## I.  BACKGROUND[1]

Plaintiffs Robert Coward and Lenny Starks are both disabled men who rely on motorized wheelchairs. Plaintiffs are also regular users of the District of Columbia Lottery ("D.C. Lottery" or the "Lottery"). Coward plays the Lottery twice each month. Starks plays the Lottery every day.

Defendant District of Columbia administers the D.C. Lottery through the District of Columbia Lottery and Charitable Games Control Board ("the Board"), of which Defendant Buddy Roogow is Executive Director. The Board conducts the Lottery by licensing persons and organizations, including liquor stores, gas stations, and grocery markets, to sell Lottery tickets.

In order to receive a license to sell Lottery tickets, an applicant must complete a multi-step review process. D.C. Mun. Regs. Tit. 30, §§ 200-209. This review process is overseen by an independent agency (the "Agency") operating under the authority and direction of the Board and the supervision of its Executive Director.

---

[1] In evaluating a motion to dismiss under Rule 12(b)(1), a court may "consider the complaint supplemented by undisputed facts evidenced in the record or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted). Therefore, the facts as set forth are drawn from the Amended Complaint and, where necessary for resolution of the Motion to Dismiss or the Motions for Summary Judgment, from the parties' Statements of Material Facts Not in Dispute.

First, the Agency evaluates an application form against eligibility criteria that include criminal history, credit history, and any history of missed payments of moneys owed to the District of Columbia. Second, a "licensing specialist" conducts a physical inspection of the applicant business and reviews the applicant's employees, physical security, and ability to redeem lottery tickets. Third, the Agency assesses the applicant focusing on marketing and sales volume. Fourth, and finally, the Executive Director, currently Roogow, selects recommended applicants for licensing. Once licensed, Lottery dealers are subject to annual "midcycle" reviews and must undergo biennial inspections against the Board's eligibility criteria to be relicensed.

Plaintiffs Coward and Starks have both found that their use of motorized wheelchairs makes it difficult for them to play the Lottery at their preferred locations. Coward is not able to enter any of his preferred four locations without assistance from a clerk or fellow customer. At one of these four locations, Coward must also rely on assistance from the clerk or another customer in order to pay, as the counter where the Lottery tickets are sold is too high for him to reach. Of the six locations where Starks prefers to play the Lottery, Starks is unable to enter or play the Lottery without assistance at three of them. At another of the six locations, boxes must be moved out of his way in order to make the Lottery accessible to him.

On October 2, 2009, the Board published a Notice of Proposed Rulemaking in the District of Columbia Register to mandate certain accessibility requirements for licensed Lottery dealers. 56 D.C. Reg. 7844 (Oct. 2, 2009). The Rule, adopted on November 6, 2009, 56 D.C. Reg. 8738 (Nov. 6, 2009)(to be codified at D.C. Mun. Regs. Tit. 30, § 311), sets out minimum standards of accessibility for allowing disabled persons to play the Lottery. D.C. Mun. Regs. Tit. 30, § 311. The Rule instructs the Board to inspect a potential licensee's accessibility as part of the licensing process and outlines a process under which the Board inspects existing Lottery sales agents for compliance with the Rule's accessibility standards and considers exemptions from the Rule's requirements.[2] Finally, the Rule allows an aggrieved party to initiate enforcement against a non-compliant agent by complaint to the Executive Director.

Since enactment of the Rule, the Board has granted approximately six new licenses following a mandatory barrier-removal process. The Board has put applications from non-compliant businesses on hold until those businesses remove specified barriers. The Board has stated that it intends to move forward with mandatory barrier-removal actions for all Lottery sales agents during its next license renewal cycle in 2011. Pls. Statement of Facts at ¶ 42.

---

[2] Exemptions are provided for historic properties, legal impediments to barrier removal, landlord refusal, undue financial hardship, and technical infeasibility.

Plaintiffs filed their Complaint on November 14, 2006 alleging that Defendants' policies "exclud[e] them from participation in and deny[] them the same opportunity as non-disabled persons to the benefits of the D.C. Lottery because of their disability," in violation of Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132 et seq., and that Defendants' policies "subject[] qualified persons with disabilities to discrimination and exclude[] them from participation in and den[y] them the benefits of the services and activities of the D.C. Lottery Board," in violation of the Rehabilitation Act, 42 U.S.C. § 794 et seq., and the D.C. Human Rights Act, D.C. Code § 2-1401.01 et seq. Compl. at ¶¶ 46, 52, 57 [Dkt. No. 1]. Plaintiffs filed an Amended Complaint on December 21, 2009 [Dkt. No. 66]. Plaintiffs seek an order declaring that Defendants violated federal and District of Columbia law; an injunction or other equitable remedy preventing the D.C. Lottery from issuing new Lottery licenses or renewing Lottery licenses for businesses inaccessible to persons with disabilities; money damages in an amount to be determined at trial; and reasonable attorneys' fees.

After completion of discovery, Defendants filed the instant Motion to Dismiss, or in the Alternative, for Summary Judgment [Dkt. No. 76] (hereinafter referred to as "Defendants' Motion to Dismiss"), and Plaintiffs filed the instant Motion for Partial

Summary Judgment [Dkt. No. 77] on July 2, 2010.[3] Defendants and Plaintiffs filed their respective oppositions on July 26, 2010 [Defendants, Dkt. No. 79; Plaintiffs, Dkt. No. 80]. Replies were filed on August 9, 2010 [Defendants, Dkt. No. 82; Plaintiffs, Dkt. No. 83].

## II. STANDARD OF REVIEW

Defendants ask the Court to dismiss Plaintiffs' claims under Rule 12(b)(1). Under Rule 12(b)(1), Plaintiffs bear the burden of proving by a preponderance of the evidence that the Court has subject matter jurisdiction. See Shuler v. U.S., 531 F.3d 930, 932 (D.C. Cir. 2008). In reviewing a motion to dismiss for lack of subject matter jurisdiction, the Court must accept as true all of the factual allegations set forth in the Complaint; however, such allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Wilbur v. CIA, 273 F. Supp. 2d 119, 122 (D.D.C. 2003)(citations and quotations omitted). The Court may rest its decision on its own resolution of disputed facts. Id.

Both parties also seek summary judgment. Summary judgment may be granted "only if" the pleadings, the discovery and disclosure

_____

[3] Plaintiffs moved for partial summary judgment as to liability, "but reserve[d] all arguments related to an appropriate remedy, including compensatory damages and attorneys' fees." Pls. Statement of P. & A. in Supp. of Pls. Mot. For Partial. Summ. J. (hereinafter referred to as "Plaintiffs' Motion For Summary Judgment") at 9.

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c), as amended December 1, 2007; <u>Arrington v. United States</u>, 473 F.3d 329, 333 (D.C. Cir. 2006). In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is, that it is "material" to the case. "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" <u>Arrington</u>, 473 F.3d at 333, <u>quoting</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the case under the substantive governing law. <u>Liberty Lobby</u>, 477 U.S. at 248.

In <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 . . . (1986) (footnote omitted). "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."

<u>Liberty Lobby</u>, 477 U.S. at 247-48 (emphasis in original).

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." <u>Liberty Lobby</u>, 477 U.S. at 248, 249. In both <u>Liberty Lobby</u> and <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment. <u>Liberty Lobby</u>, 477 U.S. at 255.

In assessing a motion for summary judgment and reviewing the evidence the parties claim they will present, "[t]he non-moving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Liberty Lobby</u>, 477 U.S. at 255). "To survive a motion for summary judgment, the party bearing the burden of proof at trial . . . must provide evidence showing that there is a triable issue as to an element essential to that party's claim." <u>Arrington</u>, 473 F.3d at 335; <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). "[I]f the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance, summary judgment is

improper." <u>United States v. Philip Morris</u>, 316 F. Supp. 2d 13, 16 (D.D.C. 2004) (quoting <u>Greenberg v. FDA</u>, 803 F.2d 1213, 1216 (D.C. Cir. 1986)).

## III. ANALYSIS

In cross-motions, the parties seek either dismissal or judgment as a matter of law. Defendants argue that Plaintiffs' claims under District of Columbia law must be dismissed for failure to comply with the notice requirement of D.C. Official Code § 12-309, and that the case must be dismissed as to Plaintiffs' federal law claims for failure establish Article III standing. Defs. Mot. to Dismiss at 10-15. Alternatively, Defendants argue that they are entitled to judgment as a matter of law because Plaintiffs are unable to prove that Defendants discriminated against them as persons with disabilities. <u>Id.</u> at 17-30. Plaintiffs move for partial summary judgment on the grounds that no material facts are in dispute and the record proves Defendants' liability for discrimination against persons with disabilities. Pls. Mot. for Summ. J. at 10-30.

### A.    Defendants Waived Section 12-309

Section 12-309 of the District of Columbia Code precludes actions against the District of Columbia for unliquidated damages "unless, within six months after the injury or damage was sustained, the claimant . . . has given notice in writing to the Mayor of the District of Columbia." D.C. Official Code § 12-309.

Defendants argue that Plaintiffs' failure to abide by the notice requirement of Section 12-309 mandates the dismissal of Plaintiffs' claims based on District of Columbia law. Defs. Mot. to Dismiss at 10-12.

Defendants claim that Section 12-309 is jurisdictional. Id. at 10. Although compliance with Section 12-309 has been described as "mandatory," the notice requirement of Section 12-309 is not jurisdictional. See Sanders v. District of Columbia, No. 97-2938 (PLF), 2002 WL 648965, at *2 (D.D.C. Apr. 15, 2002). Rather, non-compliance with Section 12-309 must be raised as an affirmative defense or its protections are subject to waiver. Lerner v. District of Columbia, 362 F. Supp. 2d 149, 166 (D.D.C. 2005); Sanders, 2002 WL 648965, at *2.

Defendants failed to raise Section 12-309 as a defense during the three and one-half years that elapsed between the filing of the initial Complaint and their Motion to Dismiss. Nor did Defendants raise Section 12-309 as an affirmative defense in either their Answer filed January 22, 2007 [Dkt. No. 4] or in their Answer to the Amended Complaint filed January 13, 2010 [Dkt. No. 67].

Therefore, the Court concludes that Defendants have waived the protection of Section 12-309.

**B.    Plaintiffs Coward and Starks Have Standing**[4]

Defendants argue that Plaintiffs' suit must be dismissed because they lack Article III standing. Defs. Mot. to Dismiss at 12-15. Article III limits federal jurisdiction to actual cases and controversies. "Three inter-related judicial doctrines—standing, mootness, and ripeness-ensure that federal courts assert jurisdiction only over" such disputes. <u>Worth v. Jackson</u>, 451 F.3d 854, 855 (D.C. Cir. 2005). It has long been well established that standing is one of the bedrock requirements any litigant seeking relief in federal court must satisfy. <u>See</u> <u>Valley Forge Christian College v. Americans United for Separation of Church and State</u>, 454 U.S. 464, 472 (1982). The "irreducible constitutional minimum" of standing requires plaintiffs to demonstrate that they have suffered an "injury in fact" that is "caused by the challenged conduct and redressable through relief sought from the court." <u>Shays et al. v. F.E.C</u>., 414 F.3d 76, 83 (D.C. Cir. 2005).

Defendants challenge the first and third elements, alleging that Plaintiffs Coward and Starks cannot show that they have suffered (1) an actual injury that is (2) redressable by the relief sought. Each prong is addressed in turn.

---

[4] Defendants have not challenged the organizational standing of Plaintiff Equal Rights Center.

### 1. Plaintiffs Have Suffered Injury-in-Fact

The first element of standing, "injury-in-fact," requires a plaintiff to allege an injury that is both (a) concrete and particularized and (b) actual or imminent rather than speculative or generalized. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Although Plaintiffs bear the burden of establishing the Court's subject-matter jurisdiction, "at the standing stage, the Court must presume the validity of [Plaintiffs'] legal theory." Disability Rights Council of Greater Washington v. D.C., No. 04-529 (JDB), 2005 WL 513495, at *1 (D.D.C. March 3, 2005) (citing Campbell v. Clinton, 203 F.3d 19, 23-24 (D.C. Cir. 2000)); see also Lujan, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing [the standing] elements.").

Defendants contend that Plaintiffs have been able to play the D.C. Lottery and therefore have not been "excluded from participation in or denied the benefits of some public entity's services, programs, or activities or . . . otherwise discriminated . . . against by reason of [their] disability" under Title II of the ADA or under analogous provisions of the Rehabilitation Act. 42 U.S.C. § 12132; 29 U.S.C. § 794 ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance").

Defendants' argument conflates the standing inquiry with the merits of Plaintiffs' case. At this stage, Plaintiffs' factual allegations must be taken as true and their legal theory must be credited. Campbell, 203 F.3d at 23-24. Hence, on this Motion to Dismiss, we must assume that Defendants have discriminated against Plaintiffs by reason of their disability. See Am. Compl. at ¶¶ 43-47. To survive the Motion to Dismiss, Plaintiffs need allege only that they have suffered actual injury resulting from the claimed inaccessibility. See, eg., Disability Rights Council, 2005 WL 513495, at * 1 (finding that the injury-in-fact requirement demands that plaintiff allege "actual, concrete injuries that arise from the inaccessibility" claimed).

Plaintiffs have alleged concrete and particular injury as required by Lujan. 504 U.S. at 560. The Complaint states that Coward and Starks often wait outside their most convenient Lottery locations for long periods of time and must ask for assistance from others in order to enter those locations and play the Lottery. Am. Compl. at ¶¶ 23-27. Coward and Starks also state that they face increased risk to their personal safety because they have to wait in neighborhoods populated with prostitutes and drug addicts, that they sacrifice time when seeking accessible businesses, and that they suffer humiliation because they must rely upon the goodwill of passing strangers to help them play the Lottery. Am. Compl. at ¶¶

23-24, 38; Pls. Statement of Facts at ¶¶ 54-68, 72-84;[5] see Disability Rights Council, 2005 WL 513495, at * 1 (finding injury-in-fact where plaintiff had to spend extra time looking for accessible parking spaces, suffered humiliation asking others for help to pay parking meters, and incurred additional expense parking at private garages).

Plaintiffs have also adequately alleged imminent injury. Lujan, 504 U.S. at 560; Center for Biological Diversity v. U.S. Dept. of Interior, 563 F.3d 466, 478 (D.C. Cir. 2009). According to the Complaint, Coward purchases Lottery tickets about twice each month, though he would play more if he found the locations convenient to him to be accessible and Starks plays the Lottery almost every day at several locations in the District of Columbia. Am. Compl. ¶¶ 21, 25.

## 2. Plaintiffs' Injuries Are Redressable

Defendants also challenge Plaintiffs' standing on the grounds of redressability. Defs. Mot. to Dismiss at 14-15. Redressability requires a showing that it is "'likely,' as opposed to merely 'speculative,'" that favorable judicial action will redress any harm plaintiff has suffered. Lujan, 504 U.S. at 561 (internal

---

[5] As noted above, supra note 1, in evaluating a motion to dismiss for lack of subject matter jurisdiction, a court may "consider the complaint supplemented by undisputed facts evidenced in the record or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Coalition for Underground Expansion, 333 F.3d at 198(citations omitted).

citations omitted); see also The Wilderness Soc'y v. Norton, 434
F.3d 584, 590 (D.C. Cir. 2006). Defendants argue that Plaintiffs'
injuries are not redressable because Title II mandates only that
the Lottery be accessible, not that any individual Lottery facility
be accessible to the Plaintiffs. See 28 C.F.R. § 35.150(a). Under
Defendants' logic, therefore, a finding favorable to the Plaintiffs
cannot guarantee that Coward or Starks would not suffer the
indignity of having to rely on the assistance of others to play the
Lottery at some location in the future. See Defs. Mot. to Dismiss
at 14-15.

A favorable finding for the Plaintiffs would at least have the
effect of forcing Defendants to increase the accessibility of the
D.C. Lottery. A Court Order requiring Defendants to provide for a
greater number of accessible locations or for a greater number of
accessible alternatives would result in greater program
accessibility. A program with greater accessibility might not
guarantee that the Plaintiffs could play the Lottery without
impediment at every Lottery location, but would reduce if not
eliminate the Plaintiffs' need to subject themselves to safety
risks or to rely on others for help at so many of the locations
they wish to access. Plaintiffs need only show that the relief
sought would "significantly" -- not completely -- redress their
injuries. Int'l Ladies' Garment Workers' Union v. Donovan, 722 F.2d
795, 812 n. 27 (D.C. Cir. 1983).

In sum, Plaintiffs have adequately alleged that they have suffered injury due to increased risk relating to personal safety resulting from having to wait outside for assistance from a clerk and due to humiliation caused by relying on the help of others in order to play the Lottery. Further, Plaintiffs have adequately alleged that a Court Order would redress these injuries by significantly reducing the risk to their personal safety and the humiliation they suffer caused by the difficulties in accessing places of business selling Lottery tickets. Consequently, Defendants are not entitled to dismissal of Plaintiffs' claims.

### C. Defendant's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment Are Denied

#### 1. Governing Standards

The ADA, signed into law on July 26, 1990, aims "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).[6] The Statute includes three separate titles, relating to discrimination: Title I--by employers engaged in an industry affecting interstate commerce; Title II--by State and local governments operating public services or programs; and Title III--

---

[6] Because the Rehabilitation Act and the DCHRA are "in pari materia" with Title II of the ADA and cases interpreting those laws are "interchangeable," only Title II of the ADA will be discussed. See Am. Council of the Blind v. Paulson, 525 F.3d 1256, 1262 n. 2 (D.C. Cir. 2008)(internal quotations omitted); Teru Chang v. Inst. For Public-Private P'ship, 846 A.2d 318, 324 (D.C. 2004).

by private entities operating public accommodations and services.[7] 42 U.S.C. §§ 12111-12189.

The parties agree that Title II governs Plaintiffs' claims. What they disagree about is whether accessibility guidelines contained in the Regulations issued by the Department of Justice ("DOJ") pursuant to Title III ("DOJ Title III Regulations" or "Title III Regulations") should be used as the standard for judging compliance with Title II.[8]

Title II mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to prove that a public program violates Title II, a plaintiff must show that "(1) he [or she] is a qualified individual with a disability; (2) he [or she] was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or

_____

[7] Titles IV and V contain provisions concerning telecommunications services for hearing-impaired and speech-impaired individuals and miscellaneous provisions, respectively. 47 U.S.C. §§ 225, 611; 42 U.S.C. §§ 12201-12213.

[8] The DOJ Title III Regulations include comprehensive standards, known as the ADA Accessibility Guidelines ("ADAAG"), which apply to all new construction and alterations subject to Title III. 28 C.F.R. Pt. 36, App. A; 28 C.F.R. § 36.406. It should also be noted that DOJ has issued separate Regulations pursuant to Title II ("DOJ Title II Regulations" or "Title II Regulations") that do not contain ADAAG standards.

was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his [or her] disability." <u>Sindram v. Kelly</u>, No. 06-1952 (RBW), 2008 WL 3523161, at *4 (D.D.C. Aug. 13, 2008); <u>see also</u> <u>Buchanan v. Maine</u>, 469 F.3d 158, 170-71 (1st Cir. 2006).

Defendants do not contest that Plaintiffs are qualified individuals with disabilities. Rather, the central issue in this case is whether the low number of licensed Lottery locations that are accessible--under the Plaintiffs' definition--to persons with disabilities constitutes "exclus[ion] from participation in or den[ial of] the benefits of" the Lottery program, or discrimination by the District of Columbia.[9]

The Title II Regulations provide that a "public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."[10] 28 C.F.R. § 35.150(a). The Regulations further clarify that they do

---

[9] Defendants also do not dispute that the D.C. Lottery is a public program covered by Title II. Defs. Mot. to Dismiss at 16-17.

[10] As the Department of Justice promulgated these Regulations pursuant to explicit grant of authority by Congress, they are to be given "controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." <u>U.S. v. Morton</u>, 467 U.S. 822, 834 (1984); <u>see also</u> 42 U.S.C. § 12134(a); <u>McGary v. City of Portland</u>, 386 F.3d 1259, 1269 n. 6 (9th Cir. 2004) ("Department of Justice regulations interpreting Title II should be given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute") (internal quotations omitted).

not "require a public entity to make _each_ of its existing facilities accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a)(1) (emphasis added). Hence, the ultimate question in evaluating a Title II claim is whether, taken as a whole, the State or local government's "program" is readily accessible to individuals with disabilities. See Pascuiti v. New York Yankees, 87 F.Supp.2d 221, 223 (S.D.N.Y. 1999).[11]

Plaintiffs argue that the accessibility of the D.C. Lottery program can "only" be determined by assessing how many licensed locations are accessible to individuals with disabilities, and that accessability must be measured against ADAAG standards. Pls. Reply at 2-3. Defendants deny that Title II incorporates the Title III accessibility standards. Defendants contend that the D.C. Lottery's accessibility must be determined solely by reviewing the overall accessibility of the Lottery program. Defs. Mot. to Dismiss at 16-23.

The language and structure of the ADA belie Plaintiffs' claim that Title III standards should be absorbed into the Title II program accessibility requirement. Title II precisely forbids discrimination caused when a qualified individual is "excluded from participation in or . . . denied benefits of services, programs, or

---

[11] The Court recognizes that Pascuiti did not involve a fact pattern identical to this case. That court ruled that the accessibility of a single entity--Yankee Stadium--must be looked at as a whole, rather than its individual areas or sections. Pascuiti, 87 F.Supp.2d at at 223-24.

activities." 42 U.S.C. § 12132. Title III's prohibitions are both more extensive and more specific, banning numerous forms of disparate treatment and requiring private entities to make particular, specific renovations to ensure accessibility. 42 U.S.C. § 12182.

Had Congress wished to subject State and local government programs to the identical exacting rules of accessibility imposed on private entities in Title III, it could have easily done so. It did not. See Russello v. U.S., 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") Indeed, it is perfectly logical that Congress would grant greater flexibility to State and local government programs, as "[p]rogram accessibility has proven to be a useful approach" in past contexts because it allowed subject parties "to make their federally assisted programs and activities available to individuals with disabilities without extensive retrofitting of their existing buildings and facilities, by offering those programs through alternative methods." 28 C.F.R. Pt. 35, App. A.

Moreover, the Department of Justice itself has drawn a sharp distinction between obligations imposed by its Title II and Title III Regulations. In its Title III Regulations, the Department of

Justice made plain that "actions of public entities are governed by title [sic] II of the ADA and will be subject to regulations issued by the Department of Justice under that title." 28 C.F.R. Pt. 36, App. B; see also Disabled Rights Action Comm. v. Las Vegas Events, Inc., 375 F.3d 861, 882 (9th Cir. 2004) ("Title III imposes obligations distinct from those imposed by Title II, and more onerous ones."); Pickern v. Pier 1 Imports (U.S.), Inc., 339 F.Supp.2d 1081, 1086 (E.D. Cal. 2004) ("In writing the ADAAG regulations, the Department of Justice took pains to maintain a separation between public liability under Title II and private entity liability under Title III."); Tyler v. Kansas Lottery, 14 F.Supp.2d 1220, 1227 (D. Kan. 1998) (noting that ADAAG compliance "is not necessary for program accessibility.").

The Department of Justice further elaborates on the requirements of program accessibility in its Title II Technical Assistance Manual ("Title II TAM").[12] In relevant part, DOJ advises State and local governments that "[p]ublic entities may achieve program accessibility by a number of methods" including "alternatives to structural changes" such as "provision of services at alternate accessible sites." Title II TAM, at II-5.2000. Because a "public entity must make its 'programs' accessible," "[u]nlike

---

[12] The Title II TAM is published by the Department of Justice "to present the ADA's requirements for State and local governments in a format that will be useful to the widest possible audience." Title II TAM, Introduction, available at http://www.ada.gov/taman2.html.

private entities under title III, public entities are not required to remove barriers from <u>each</u> facility, <u>even if removal is readily achievable</u>." <u>Id.</u> (emphasis added). Rather, "[p]hysical changes to a building are required only when there is no other feasible way to make the program accessible." <u>Id.</u> Therefore, in a Title II suit, Plaintiffs must demonstrate that the public program in its entirety is not accessible to them by reason of their respective disabilities. Title II does not impose liability merely on a showing that there are locations licensed as part of a public program that do not satisfy Title III's Regulations.

The fact that Title III's Regulations are not controlling in evaluating program accessibility does not mean that the standards contained in those Regulations are never relevant in Title II cases. For example, the Southern District of New York found that Plaintiffs could use the Title III standards as a baseline for measuring Yankee Stadium's accessibility, albeit with the caveat that in order to "establish that the City has violated the ADA, plaintiffs still would have to . . . prove that the Stadium, viewed in its entirety, is not readily accessible." <u>Pascuiti</u>, 87 F.Supp.2d at 226.[13]

_____

[13] Notably, <u>Pascuiti</u> and cases like it concern access to programs that occur at a single location, not programs that are administered through local businesses in many different locations, like the D.C. Lottery. Such cases demonstrate that Title III standards might provide useful evidence of a program's accessibility where that program is administered at a single facility, but that failure to adhere to Title III's standards does

**2.  Defendants' Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment Are Denied Because Material Facts Remain in Dispute**

As explained above, a defendant satisfies its Title II obligations when the public program in question, "viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). Defendants seek summary judgment on the ground that Plaintiffs cannot prove that the D.C. Lottery is currently an inaccessible program under Title II. Plaintiffs seek summary judgment on the ground that the material facts not in dispute prove that the Lottery is not accessible. Both parties argue that no material facts remain in dispute and that Defendants' liability may be determined as a matter of law. They are both wrong. The evidence discloses significant, material questions that can only be resolved by a fact-finder. Whether the Lottery's program is accessible to persons with disabilities is ultimately a question of fact.

_____

not alone constitute a Title II violation, even where the program does not exist at alternate sites. Pascuiti, 87 F.Supp.2d at 226; Disabled Rights Action Comm., 375 F.3d at 882 (explaining that a finding of liability under Title III would not necessarily imply liability under Title II for the same building).

### a. Whether Defendants' Lottery Accessibility Regulations Create an Accessible Program Is a Material Fact in Dispute

The District of Columbia Municipal Regulations adopted under Title II contain provisions to guarantee that the D.C. Lottery "is in compliance with the ADA by ensuring that people with disabilities have access to the Lottery Program." D.C. Mun. Regs. Tit. 30, § 311.1. Defendants have voluntarily incorporated some if the standards in the Title III Regulations in their Title II Regulations by requiring that all sales agents in the Lottery Program meet the more stringent ADAAG, contained in Title III, with respect to (1) parking, (2) any exterior route connecting parking or public way to an accessible entrance, (3) the entrance, and (4) any interior route from the entrance to the site where the Lottery is played. D.C. Mun. Regs. Tit. 30, § 311.2. The Agency must inspect licensed agents and a noncompliant agent will have 90 days to comply with the compliance report. D.C. Mun. Regs. Tit. 30, § 311.3. The Agency may not grant new licenses to noncompliant applicants. D.C. Mun. Regs. Tit. 30, § 311.2. The Regulations provide for exceptions and alternatives which echo DOJ's commentary on the requirements of program accessibility. See D.C. Mun. Regs. Tit. 30, § 311.5; Title II TAM at II-5.2000; 28 C.F.R. Pt. 35, App. A.

Plaintiffs contend that the Lottery Regulations "ultimately fail to ensure program accessibility."[14] Pls. Mot. for Summ. J. at 16. However, reasonable persons could disagree as to whether the Regulations do, in fact, create accessible Lottery locations. Plaintiffs argue that the Lottery Regulations fail to create an accessible program for three reasons:

(1) An exemption for improvements that cost more than 25% of the total compensation earned by the sales agent from the Lottery each year is too broad for compliance with Title II. Pls. Mot. for Summ. J. at 17; D.C. Mun. Regs. Tit. 30, § 311.5(d).

(2) The Lottery Regulations fail to ensure that accessible Lottery agents are fairly distributed across the District. Pls. Mot. for Summ. J. at 18-21.

(3) The Lottery Regulations do not require accessible sales counters as required by ADAAG standards. Pls. Mot for Summ. J. at 22-23.

---

[14] It is not entirely clear from Plaintiffs' papers whether they believe that the claimed insufficiency of Defendants' Regulations would provide an independent basis for liability under Title II. See Pls. Mot. for Summ. J. at 16-24. As Plaintiffs have cited no statute, regulation, or case indicating that Defendants are required to promulgate accessibility regulations pursuant to Title II, the Court assumes that Plaintiffs are arguing merely that Defendants' Regulations do not suffice to defeat their Motion for Partial Summary Judgment.

Each of these issues demand factual resolution by a fact-finder.[15]

First, the fact-finder should consider the sufficiency of the Regulations' hardship exemption. The Lottery Regulations do not require licensees to undertake improvements that cost more than 25% of the total compensation earned by the sales agent from the Lottery each year. D.C. Mun. Regs. Tit. 30, § 311.5(d).[16] The Regulations further require that any time an exemption is granted, alternative service must be provided through curb service or signage directing customers to the nearest accessible Lottery sales agent. D.C. Mun. Regs. Tit. 30, § 311.5(f).[17] Therefore, the fact-finder must consider whether granting an exemption for improvements costing 25% of the total compensation earned by the sales agent

_____

[15] Plaintiffs also contend that Defendants will not administer their Regulations with sufficient vigor to guarantee program accessibility. Pls. Mot. for Summ. J. at 24. Plaintiffs rest this claim on the deposition testimony of the ADA Coordinator for the Lottery Board, which indicates his belief that the Lottery is reasonably accessible. Id. Speculation as to Defendants' future enforcement of its own Regulations is not a proper consideration for the fact-finder.

[16] An exemption for financial hardship is explicitly permitted by DOJ's Title II Regulations. 28 C.F.R. § 35.150(a)(3).

[17] Alternate service is a permissible method for fulfilling the requirements of program access under Title II. See Tennessee v. Lane, 541 U.S. 509, 532 (2004) ("a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites"); 28 C.F.R. Pt. 35, App. A (the program accessibility requirement may make "programs and activities available . . . through alternative methods"); Title II TAM, at II-5.2000 ("[p]ublic entities may achieve program accessibility by a number of methods" including "alternatives to structural changes" such as "provision of services at alternate accessible sites").

from the Lottery each year would render the program inaccessible, and, if it would, whether the permitted alternatives--curb service or signage directing customers to the nearest accessible store--are sufficient to restore accessibility.

Second, the fact-finder should consider whether the Regulations will ensure that accessible Lottery locations are reasonably distributed across the District to make the Lottery program accessible. Although each Lottery location need not be accessible, alternative sites must be sufficient and sufficiently accessible such that persons with disabilities can access the program. See Anderson v. Dep't of Public Welfare, 1 F.Supp.2d 456, 463 (E.D. Pa. 1998).[18]

Third, the fact-finder should consider whether the Lottery Regulations' failure to prescribe accessibility standards for sales

---

[18] Plaintiffs cite Anderson as support for the notion that all locations should be required to be accessible because "Anderson protected . . . the recipients' ability to choose which provider they obtained care from." See Pls. Mot. for Summ. J. at 19 (emphasis in the original). However, Plaintiffs misconstrue Anderson's holding. Anderson held, in part, that certain program providers must be made accessible due to a regulation promulgated by the Department of Health and Human Resources under the Rehabilitation Act specifying access requirements for small health, welfare, and other social service providers. Anderson, 1 F.Supp.2d at 465; 45 C.F.R. § 84.22(c)(permitting only small health, welfare, and other social service providers with fewer than fifteen employees to refer persons with disabilities to alternative sites for service). Sales agents for the D.C. Lottery do not receive financial assistance for the Lottery program from the Department of Health and Human Services, nor are Lottery agents health, welfare, or other social services providers. See 45 C.F.R. §§ 84.2, 84.22(c). The Lottery is subject only to the program access requirement of Title II and not to 45 C.F.R. § 84.

counters renders the Lottery an inaccessible program. D.C. Mun. Regs. Tit. 30, § 311.2(b); <u>see</u> <u>also</u> Pls. Mot for Summ. J. at 22-23. Although Defendants did incorporate ADAAG standards for various other elements of a licensee's location, they elected not to set out standards for the appropriate height of sales counters. <u>See</u> D.C. Mun. Regs. Tit. 30, § 311.2. Instead, the Lottery Board has purchased clipboards for distribution to sales agents with high sales counters. Pls. Statements of Facts ¶ 41. Although Defendants are not bound by ADAAG requirements for compliance with Title II, <u>see</u> <u>supra</u> Part III.C.1, the fact-finder must resolve the factual question of whether the decision to not specify any accessibility requirements for sales counters and instead to permit the use of clipboards to compensate for high counters renders the Lottery inaccessible.

### b. Whether the D.C. Lottery Program Is Accessible to Persons With Disabilities Is a Material Fact in Dispute

If the District's Regulations are not sufficient to ensure an accessible program, the fact-finder must consider whether the D.C. Lottery is nonetheless accessible to persons with disabilities in its current form. This factual determination is not amenable to resolution by summary judgment. The fact-finder must consider a number of material issues to determine whether the Lottery in its entirety is accessible to persons with disabilities.

Plaintiffs rely heavily on the fact that, at the time this suit was initiated, only 2.6% of sales agents for the D.C. Lottery were compliant with Title III's ADAAG standards. Pls. Statement of Facts at ¶ 35. Plaintiffs argue that this percentage establishes a per se violation of Title II. Pls. Reply at 2-3. Plaintiffs principally rely on Tyler v. Kansas Lottery, where the court suggested that even a showing that only 45% of Lottery locations comply with Title III's standards would suffice to prove program inaccessibility. See Pls. Mot. for Summ. J. at 15; Tyler, 14 F.Supp.2d at 1225.

Since Tyler was decided on standing grounds, it clearly cannot establish a percent-compliance threshold based on Title III standards. Tyler simply left open the possibility that, had the case not been dismissed for lack of standing, the plaintiff could potentially have proven a violation of Title II. Tyler notes that the "record before the court supports the conclusion that there is not statewide compliance with Title II" and that "it is possible that plaintiff could prove a violation of the ADA." Tyler, 14 F.Supp.2d at 1227-28. Indeed, the Court rejected the argument that a State or local government could not contract with an inaccessible retailer, so long as the program, viewed in its entirety, was accessible. Id. at 1227.

In addition, Title II's Regulations set no minimum requirement for percentage of accessible program locations. Defendants may

comply with the program accessibility requirement by means other than structural change, including use of alternate locations. Defendants need not make all locations accessible, nor is program accessibility "location-dependent." Bird v. Lewis & Clark College, 303 F.3d 1015, 1022 (9th Cir. 2002). Therefore, Plaintiffs' evidence regarding the percentage of Lottery locations inaccessible under the ADAAG standards does not, as a matter of law, prove a violation of Title II. Instead, the fact-finder must determine whether, in light of all relevant aspects of the Lottery program, the program in its entirety is inaccessible.

In reaching its determination of whether the Lottery is accessible to persons with disabilities, the fact-finder may consider the number of accessible Lottery locations, their geographical distribution throughout the City, and the distance and difficulty disabled persons are likely to face in order to reach an accessible location. For example, Plaintiffs Coward and Starks have presented evidence regarding what they must do in order to play the Lottery. Coward faces significant difficulty playing the Lottery at the locations, which, to his knowledge, are nearest to his home. See Pls. Statement of Facts at ¶¶ 47-68. For his part, Starks plays the lottery every day. Defs. Statement of Facts at ¶ 10. Of Starks' six preferred Lottery locations, two are accessible under the more stringent ADAAG standards. See Pls. Statement of Facts at ¶¶ 72-86. Although Starks cannot play the Lottery without difficulty at all

six of his preferred locations, he is able to access and play the Lottery.

Ultimately, the fact-finder must determine whether the D.C. Lottery, viewed in its entirety, is accessible to persons with disabilities. Because this is a factual question about which, given the evidence submitted by the parties, reasonable persons could disagree, summary judgment is not appropriate.

### c. Defendants Were Not Required to Develop a Transition Plan

Finally, Plaintiffs argue that Defendants violated Title II Regulations by failing to develop a transition plan for structural changes to the Lottery program. DOJ's Regulations require that "[i]n the event that structural changes to facilities will be undertaken to achieve program accessibility, a public entity that employs 50 or more persons shall develop . . . a transition plan setting forth the steps necessary to complete such changes." 28 C.F.R. § 35.150(d)(1). Defendants do not contest that they never developed a transition plan for the Lottery. Defs. Opp'n to Pls. Mot. for Summ. J. At 9-10.

At issue is the meaning of the phrase "structural changes to facilities." 28 C.F.R. § 35.150(d)(1). Defendants argue that the transition plan requirement only applies when structural changes are made to Defendant's own buildings. Defs. Opp'n to Pls. Mot. for Summ. J. at 10.

Defendants' reading of the transition plan requirement is correct. The Title II Regulations elaborate on the requirements of any transition plan, specifying that the plan must "[i]dentify physical obstacles in the <u>public entity's facilities</u> that limit the accessibility of its programs or activities to individuals with disabilities." 28 C.F.R. § 35.150(d)(3)(I) (emphasis added). Because Plaintiffs have failed to identify any physical changes to Defendants' buildings, Plaintiffs are not entitled to summary judgment based on Defendants' lack of a transition plan.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment is **denied** and Plaintiffs' Motion for Partial Summary Judgment is **denied.**


October 5, 2010
<u>    /s/                         </u>
Gladys Kessler
United States District Judge

**<u>Copies to</u>**: attorneys on record via ECF